Stephen A. Weiss
Justin M. Smigelsky
Steven J. Daroci
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

Shauna B. Itri
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
(215) 564-2300

*Attorneys for Plaintiff-Relator Resolution NJ LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF NEW JERSEY *ex rel.* RESOLUTION NJ LLC,<br><br>Plaintiffs,<br><br>v.<br><br>RIVERSIDE MEDICAL GROUP, P.C.,<br><br>Defendant. | ) | Case No. 22-04165 (KM) (LDW)<br><br>**RELATOR'S FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**Table of Contents**

I. SUMMARY OF THE CASE ..... 1
II. JURISDICTION AND VENUE ..... 3
III. THE PARTIES ..... 4
IV. LEGAL AND REGULATORY FRAMEWORK ..... 5
A. The Federal False Claims Act ..... 5
B. The New Jersey False Claims Act ..... 7
C. The Medicare Program ..... 9
D. The Medicaid Program ..... 12
E. The Conditions of Payment for Medicare and Medicaid Benefits ..... 14
F. HRSA COVID-19 Uninsured Program ..... 18
V. FACTUAL ALLEGATIONS ..... 24
A. COVID-19 Background and Testing ..... 24
B. Background of Riverside and Relator ..... 28
C. Riverside Billed for Services Not Provided or That Were Medically Unnecessary ..... 30
VI. CAUSES OF ACTION ..... 35
COUNT ONE - VIOLATION OF THE FCA, 31 U.S.C. § 3729(a)(1)(A) ..... 35
COUNT TWO - VIOLATION OF THE FCA, 31 U.S.C. § 3729(a)(1)(B) ..... 35
COUNT THREE - VIOLATION OF THE FCA, 31 U.S.C. § 3729(a)(1)(G) ..... 36
COUNT FOUR - VIOLATION OF THE NJFCA, N.J.S.A. § 2A:32C-3 ..... 37
COUNT FIVE - UNJUST ENRICHMENT ..... 38
COUNT SIX - PAYMENT BY MISTAKE ..... 39
COUNT SEVEN - RETALIATION ..... 39
PRAYER FOR RELIEF ..... 40
DEMAND FOR JURY TRIAL ..... 42

## RELATOR'S FIRST AMENDED COMPLAINT

Plaintiff-Relator Resolution NJ LLC (Relator), on behalf of the United States of America (United States) and the State of New Jersey (New Jersey), brings this action against Defendant Riverside Medical Group, P.C. (Riverside) pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, and the New Jersey False Claims Act, N.J.S.A. §§ 2A:32C-1 to -18. In support thereof, Relator alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I. SUMMARY OF THE CASE

1. The global COVID-19 pandemic upturned the world in every way possible. In what seemed to be an instant, the old ways of doing business were overhauled, while fear and confusion drastically increased the opportunity for fraud in the health care industry. Here, Riverside seized the opportunity to "cash in" on the pandemic—at the expense of the United States, the State of New Jersey, and their citizens.

2. In operating three New Jersey "COVID Command Testing Centers" located in Secaucus, Medford, and Hoboken, Riverside performed hundreds of drive-thru swab tests on patients ***per day*** and—notwithstanding that in most instances no qualifying "visit" was performed for billing purposes (most encounters lasted one to two minutes, with no examination performed by a provider)—fraudulently billed patients for services that were not rendered and/or "upcoded" the services beyond the appropriate CPT billing code.[1]

3. Riverside did not and does not provide a billable examination to patients receiving drive-thru COVID-19 testing at its Testing Centers. Riverside has nevertheless submitted, and

[1] Current Procedural Terminology (CPT) codes are numbers assigned to each task and service a healthcare provider offers. They include medical, surgical, and diagnostic services. CMS and private insurers use the code to determine how much money to pay a provider.

continues to submit, false claims to Medicare, Medicaid, and the Health Resources & Services Administration (HRSA) (i) for patient encounters that do not qualify as a "visit" for billing purposes or (ii) that exceed the permissible amount set by the Centers for Medicare and Medicaid Services (CMS) for a COVID-19 symptom and exposure assessment and specimen collection (CPT Code 99211 may be billed if certain requirements are met, including if such services are provided by clinical staff incident to the physician's or non-physician practitioner's (NPP) services[2]).

4. As explained in greater detail herein, CPT billing codes ranging from 99211 through 99215 are available for qualifying outpatient "visits" of established patients. The propriety of the billing code depends on certain factors, including the time spent with the patient and the level of complexity of any necessary medical decision-making by the provider.

5. The reimbursement rate to the health care provider for a qualifying visit increases along with the code—i.e., the reimbursement amount paid to the provider is greater for CPT Code 99213 than it is for Code 99211 for a qualifying visit for an established patient. For example, utilizing CMS' Physician Fee Schedule Calculator,[3] assuming the same locality code is entered, the price for services upon entering CPT Code 99213 is $92.05, compared to $23.53 for Code 99211—a benefit of $68.52 to Riverside for this one entry). Accordingly, Riverside has tremendous financial incentive to enter higher CPT Codes.

---

[2] Effective March 1, 2020, CMS directed physicians and NPPs to use CPT Code 99211 to bill for a COVID-19 symptom and exposure assessment and specimen collection if certain requirements are met, including if such services are provided by clinical staff incident to the physician's or NPP's services.

[3] https://www.cms.gov/medicare/physician-fee-schedule/search?Y=0&T=4&HT=0&CT=3&H1=99211&M=5

6. The potential volume of Riverside's fraud is alarming. On one particularly egregious sample testing day, January 5, 2021, Riverside documentation indicates that one advanced practice nurse (APN) tested approximately ***451 patients over a span of 7.75 hours***; assuming the APN worked without break, this equates to over ***58 patients tested per hour and 1.03 minutes spent by the provider per patient encounter***.

7. Upon information and belief, Riverside upcoded each of the 451 patient encounters on January 5, 2021—many of which were beneficiaries of government healthcare programs, including, Medicare, Medicaid, and the HRSA COVID-19 Uninsured Program—and has done so each day that its COVID Command Testing Centers provided drive-thru COVID-19 testing.

8. Upon information and belief, Riverside rarely, if ever, performed any meaningful examination of any patient presenting for drive-thru COVID-19 testing, including those patients who were admittedly symptomatic. Nonetheless, Riverside fraudulently submitted, and continues to submit, claims to the government for examinations that never took place.

9. Through this conduct, Riverside knowingly caused the United States and the State of New Jersey to suffer millions of dollars in damages through inflated Medicare, Medicaid, and HRSA Program reimbursement.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730 and 3732(a) and (b) and 28 U.S.C. §§ 1331 and 1345. Supplemental jurisdiction extends to the New Jersey False Claims Act claims under 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over Riverside because, among other things, it transacts business in this judicial district and engaged in wrongdoing in this judicial district;

specifically, at all times material to this Complaint, Riverside regularly conducted substantial business within New Jersey and maintained facilities and permanent employees in New Jersey.

12. Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Riverside resides within this judicial district and transacts business within this judicial district. Moreover, acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

13. Pursuant to 31 U.S.C. § 3730(b)(2) and N.J.S.A. § 2A:32C-5(d), Resolution NJ LLC prepared and has served on the Attorney General of the United States, the United States Attorney for the District of New Jersey, and the New Jersey Attorney General written disclosures of all material evidence and information currently in its possession, along with its submission of the original Complaint in this matter,

14. This action is not based upon prior public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing in which the government or its agent is a party. Neither Relator's allegations nor the transactions detailed herein have been publicly disclosed in a Congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; in news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

15. To the extent there has been a public disclosure unknown to Relator of any of the allegations herein, Relator is the original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B).

## III. THE PARTIES

16. The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services (HHS), the Centers for Medicare and Medicaid

Services (CMS), and other federally funded health care programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

17. The State of New Jersey is a plaintiff to this action. New Jersey participates in the Medicaid program and has a False Claims Act which permits private persons, such as Relator, to sue on its behalf to recover for false and fraudulent claims submitted for payment by the Medicaid program and/or other government healthcare programs.

18. Relator Resolution NJ LLC is a Delaware domestic limited liability company, and brings this action on behalf of itself, the United States, and the State of New Jersey. Its principal place of business is c/o Seeger Weiss LLP, 55 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. The only member of Resolution NJ LLC is a physician (referred to herein as Relator) currently employed by Riverside who has personal knowledge of the fraudulent activity alleged in this Complaint. The personal knowledge of Resolution NJ LLC is not distinct from that of the Relator.

19. Defendant Riverside is a professional corporation with a principal place of business located at 1 Harmon Plaza, Secaucus, New Jersey 07094. Riverside is an integrated health care provider and serves patients throughout New Jersey and Southern Connecticut.

## IV. LEGAL AND REGULATORY FRAMEWORK

### A. The Federal False Claims Act

20. The False Claims Act (FCA) provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for payment to the United States. 31 U.S.C. §§ 3729(a)(1), amended by 31 U.S.C. § 3729(a)(1)(A).

21. The FCA also imposes liability for knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States. *See* 31 U.S.C. § 3729(a)(1)(G) (2009). The Affordable Care Act (ACA), enacted on March 23, 2010, specified that an "obligation" to pay money under the FCA can arise from "the retention of any overpayment," which are Medicare or Medicaid funds to which a provider is not entitled. 31 U.S.C. §§ 3729(b)(3); 42 U.S.C. § 1320a-7k(d)(4).

22. The ACA also requires providers who received or retain funds from Medicare or Medicaid to report and return overpayments within 60 days after the date on which the overpayment was identified. 42 U.S.C. § 1320a-7k(d)(2). The ACA specifies that any overpayment retained by a person after the deadline for reporting and returning the overpayment is an "obligation" as defined by 31 U.S.C. § 3729(b)(3) for purposes of FCA liability. 42 U.S.C. § 1320a-7k(d)(3). The requirements of this rule are meant to ensure compliance with applicable statutes, to promote the furnishing of high-quality care, and to protect the Medicare Trust Funds against fraud and improper payments.

23. For purposes of the FCA, the term "knowingly" "mean[s] that a person, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information…." 31 U.S.C. § 3729(b)(1)(A).

24. Given its remedial purposes, the FCA is interpreted broadly and is "intended to reach all types of fraud, without qualification, that might result in financial loss to the

Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). The standard of proof under the FCA is a preponderance of the evidence. 31 U.S.C. § 3731(d).

25. The FCA empowers a private person having information regarding a false or fraudulent claim against the Government to bring an action on the Government's behalf and to share in any recovery. *See* 31 U.S.C. § 3730. The complaint must be filed under seal without service on the defendant. *Id*. The complaint remains under seal to give the Government the opportunity to conduct an investigation into the allegations and to determine whether to join the action. *Id*.

26. Pursuant to the federal FCA and New Jersey False Claims Act, Relator seeks to recover, on behalf of the United States and New Jersey, respectively, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that Riverside caused to be submitted for payments, and that Riverside knew or should have known that such payments were ultimately going to be paid by government healthcare programs, including Medicare, Medicaid, and the HRSA Program.

**B. The New Jersey False Claims Act**

27. The New Jersey False Claims Act (NJFCA), N.J.S.A. §§ 2A:32C-1 to -18, was enacted on January 13, 2008, and establishes a qui tam action as a means of policing fraud on the state government. *See State ex rel. Hayling v. Correctional Medical Services, Inc.*, 422 N.J. Super. 368 (App. Div. 2011).[4]

28. The NJFCA is largely modeled on the federal FCA, closely resembling the pre-2009 version of the FCA. Specifically, under the NJFCA:

---

[4] "Qui tam" is short for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, meaning, who pursues this action on our Lord the King's behalf as well as his own. *See id.* at n.2 (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007)).

> A person shall be jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act, as may be adjusted in accordance with the inflation adjustment procedures prescribed in the Federal Civil Penalties Inflation Adjustment Act of 1990 [], for each false claim, plus three times the amount of damages which the State sustains, if the person commits any of the following acts:
>
> a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;
>
> b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;
>
> c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;
>
> d. Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;
>
> e. Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;
>
> f. Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or
>
> g. Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

N.J.S.A. § 2A:32C-3.

29. A "claim" for purposes of the NJFCA is defined as "a request or demand, under a contract or otherwise, for money, property, or services that is made to any employee, officer, or agent of the State, or to any contractor, grantee, or other recipient if the State provides any

portion of the money, property, or services requested or demanded, or if the State will reimburse the contractor, grantee, or other recipient for any portion of the money, property, or services requested or demanded." N.J.S.A. § 2A:32C-2.

30. The term "State" for purposes of the NJFCA "means any of the principal departments in the Executive Branch of State government, and any division, board, bureau, office, commission or other instrumentality within or created by such department; and any independent State authority, commission, instrumentality or agency." N.J.S.A. § 2A:32C-2.

31. The NJFCA empowers a private person having information regarding a false or fraudulent claim against the State to bring an action on the State's behalf and to share in any recovery. N.J.S.A. § 2A:32C-5. As with the federal FCA, the complaint must be filed under seal without service on the defendant, and the complaint remains under seal to give the State Attorney General the opportunity to investigate the allegations and to determine whether to join the action. *Id*.

32. Pursuant to the FCA and NJFCA, Relator seeks to recover, on behalf of the United States and New Jersey, respectively, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that Riverside caused to be submitted for payments, and that Riverside knew or should have known were going to be paid by government healthcare programs, including Medicare, Medicaid, and the HRSA Program.

**C. The Medicare Program**

33. Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the federal Medicare health insurance program for the elderly and disabled. Medicare operates by authorizing payments for inpatient and outpatient healthcare services to "providers," such as

hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and home health agencies. 42 U.S.C. §§ 1395cc(a), 1395x(u).

34. Medicare is available to individuals aged 65 and older, individuals younger than 65 who qualify for Social Security disability benefits and have been disabled for two years or more, and individuals suffering from End Stage Renal Disease or Lou Gehrig's disease.

35. The Medicare Program is comprised of four parts, including Medicare Part B (Part B), or "Medical Insurance," which is supplemental medical insurance that provides coverage for outpatient hospital visits, physician services, durable medical equipment (DME), diagnostic tests, and prescription drugs administered by a physician. Part B is a voluntary program that requires a beneficiary to pay monthly premiums along with a deductible and a 20% co-insurance payment for most services. Part B covers two types of services:[5]

1) Medically necessary services or supplies that are needed to diagnose or treat your medical condition and that meet accepted standards of medical practice; and
2) Preventative services to prevent illness or detect it at an early stage, when treatment is most likely to work best.

Most importantly for the instant matter, "Part B covers medically necessary doctor services (including outpatient services and some doctor services you get when you're a hospital patient) and covered preventative services."[6]

36. For all services and items, Medicare coverage is limited to services that are medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1).

---

[5] https://www.medicare.gov/what-medicare-covers/what-part-b-covers

[6] 2022 official Medicare booklet titled "Your Medicare Benefits," *available at* https://www.medicare.gov/Pubs/pdf/10116-your-medicare-benefits.pdf.

37. Medicare is administered by CMS, which is part of HHS. At all times relevant hereto, CMS contracted with private contractors, referred to as Medicare Administrative Contractors (MACs), to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

38. Medicare payments are typically made directly to health care providers like Riverside rather than to beneficiaries. This occurs when the Medicare beneficiary assigns his or her right to payment to the provider and, consequently, the provider submits its bill directly to Medicare for payment.

39. When a health care provider submits a Medicare claim, it represents that it is entitled to payment for the claim.

40. All healthcare providers must comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare Part B. A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *See Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 64 (1984).

41. Because it is not feasible for Medicare or its contractors to review all medical records for the millions of claims for payment it receives from health care providers every year, the Medicare Program relies upon the providers to comply with the Medicare requirements and trusts the providers to submit legitimate, truthful, and accurate claims.

42. The Medicare Program, through its contractors, also seeks to recoup payments made for improperly paid claims when such payments are identified. This includes payments made to providers for claims (a) based upon an unnecessary level of care or (b) for services not actually provided.

**D. The Medicaid Program**

43. The Medicaid Program, as enacted by Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a joint federal-state program that provides health care benefits for certain groups, primarily indigent and disabled individuals.

44. This cooperative federal-state Medicaid program directs federal funding to participating states to provide medical assistance to "families with dependent children and of aged, blind and disabled individuals, whose income and resources are insufficient to meet the costs of *necessary* medical services." 42 U.S.C. § 1396-1 (emphasis added).

45. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage (FMAP), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).

46. The Medicaid statute requires each participating state to implement and administer a state plan for medical assistance services that contains certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(10).

47. To prevent Medicaid from paying for unnecessary services, 42 U.S.C. § 1396a(a)(30)(A) requires states to maintain "methods and procedures" to "safeguard against unnecessary utilization" of Medicaid care and services.

48. Although the standard of "medical necessity" is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme. *See, e.g.*, *Beal v. Doe*, 432 U.S. 438, 444 (1977).

49. It is consistent with Medicaid objectives "for a State to refuse to fund *unnecessary*—though perhaps desirable—medical services." *Id.* at 444-45 (emphasis in original).

50. States may establish reasonable standards, consistent with the objectives of the Medicaid statute, for determining the extent of such coverage (42 U.S.C. § 1396(a)(17)), based on such criteria as medical necessity or utilization control (42 C.F.R. § 440.230(d)).

51. Many states have further defined medical necessity related to coverage under Medicaid by state statute, code, or other regulatory provision.

52. Further, state Medicaid agencies are required to perform audits to implement a statewide surveillance and utilization control program:

> The Medicaid agency must implement a statewide surveillance and utilization control program that—
>
> (a) Safeguards against unnecessary or inappropriate use of Medicaid services and against excess payments;
>
> (b) Assesses the quality of those services;
>
> (c) Provides for the control of the utilization of all services provided under the plan in accordance with subpart B of this part; and
>
> (d) Provides for the control of the utilization of inpatient services in accordance with subparts C through I of this part.

42 C.F.R. § 456.3.

53. In addition to the above, New Jersey has enacted state Medicaid laws governing, among other things, medical necessity, program quality assurance and auditing functions of carrier contractors, and subcontractor requirements. *See* N.J.S.A. §§ 30:4D-1 to -19.5.

54. For New Jersey, the federal government pays for approximately 50% of all Medicaid health services. *See* Notice, 85 Fed. Reg. 230 (Nov. 30, 2020), Table 1 – Federal Medical Assistance Percentages and Enhanced Federal Medical Assistance Percentages, Effective October 1, 2021 – September 30, 2022 (Fiscal Year 2022). Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under both the FCA and the NJFCA.

55. In return for receipt of federal subsidies, New Jersey is required to administer its Medicaid program in conformity with a state plan and federally approved waiver that satisfies the requirements of the Social Security Act and accompanying regulations. 42 U.S.C. §§ 1396-1396w.

56. Upon information and belief, at all times relevant hereto, Riverside was a participating provider who contracted with relevant MACs.

57. New Jersey Medicaid provides health insurance to certain families with dependent children, pregnant women, and people who are aged (older than 65), blind, or permanently disabled. These programs pay for hospital services, doctor visits, prescriptions, nursing home care and other healthcare needs, depending on which program the person is eligible for.[7]

58. To be eligible for New Jersey Medicaid, a person must be a resident of New Jersey; be a U.S. Citizen or qualified alien; and meet specific standards for financial income and resources.[8]

59. Healthcare needs provided for by New Jersey Medicaid include inpatient and outpatient hospital treatment; laboratory tests and X-rays; early and periodic screening, diagnostic, and treatment services; home health care; physician services; nurse-midwife services; assistance with family planning and any necessary supplies; and nursing facilities for people over 21 years of age.

**E. The Conditions of Payment for Medicare and Medicaid Benefits**

60. In accordance with Section 1834(o)(1)(A) and 1834(o)(2)(C) of the Social Security Act, CMS established payment codes that participating providers must use when

---

[7] https://www.state.nj.us/humanservices/dmahs/home/about/

[8] *Id.*

submitting a claim for payment for medically necessary or mental health visits or a qualified preventive health visit. The visit is required to be a face-to-face (one-on-one) encounter between a patient and qualifying practitioner during which time one or more billable services are furnished. A qualifying practitioner is a physician, nurse practitioner (NP), physician assistant (PA), certified nurse midwife (CNM), clinical psychologist (CP), clinical social worker (CSW), or certified diabetes self-management training/medical nutrition therapy (DSMT/MNT) provider. To qualify for payment from CMS, all of the coverage requirements for the visit must be met.

61. The following tables set forth the specific payment codes (CPT Codes) established under the Social Security Act for new patient visits and established patient visits,[9] respectively, along with the requirements for a health care provider to bill such code, including the requisite time to be spent with the patient and the complexity of necessary medical decision making for the visit:

| Code | Time | HPI | PFSH | ROS | System Exam | Presenting Problem | MDM |
|---|---|---|---|---|---|---|---|
| 99201 | 10 min. | 1-3 | None | None | 1 system | Simple with no medical intervention needed | Straightforward |
| 99202 | 20 min. | 1-3 | None | 1 | 2-5 systems | Simple with no medical intervention needed | Straightforward |
| 99203 | 30 min. | 4+ | 1 | 2-9 | 5-7 systems | 1 stable chronic condition; acute illness | Low Complex. |
| 99204 | 45 min. | 4+ | 3 | 10 | 8 systems | 2+ stable chronic problems; 1 chronic w/ mild exacerbation; undiagnosed new problem | Mod Complex. |
| 99205 | 60 min. | 4+ | 3 | 10 | 8 systems | Threat to life/body function; severe exacerbation of chronic condition | High Complex. |

| Code | Time | HPI | PFSH | ROS | System Exam | Presenting Problem | MDM |
|---|---|---|---|---|---|---|---|
| 99211 | 5 min. | ----- | ---- | ---- | ---- | ---- | Straightforward |
| 99212 | 10 min. | 1-3 | None | None | 1 system | Simple with no medical intervention needed | Straightforward |
| 99213 | 15 min. | 1-3 | None | 1 | 2-5 systems | 1 stable chronic problem or acute illness | Low Complex. |
| 99214 | 25 min. | 4+ | 1 | 2-9 | 5-7 systems | 2+ stable chronic problems or 1 chronic with mild exacerbation | Mod. Complex. |
| 99215 | 40 min. | 4+ | 3 | 10 | 8 systems | Threat to life/body function or severe exacerbation or progression of chronic condition | High Complex. |

- HPI = history of present illness
- ROS = review of systems
- PFSH = past/family/social history
- MDM = medical decision making

---

[9] A new patient is someone who has not received any professional services from the physician, or another physician of the same specialty who belongs to the same group practice, within the past three years. An established patient is someone who has received any professional service from a physician in group or same specialty within the past three years.

62. With reference to the table above, descriptions for the applicable CPT Codes for this matter are summarized as follows:

- **CPT 99211:** Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician or other qualified health care professional. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.
- **CPT 99212:** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three key components: a problem focused history; a problem focused examination; straightforward medical decision making. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting Problem(s) are self limited or minor. Typically, 10 minutes are spent face-to-face with the patient and/or family.
- **CPT 99213:** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three key components: an expanded problem focused history; an expanded problem focused examination; medical decision making of low complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Typically, 15 minutes are spent face-to-face with the patient and/or family.

- **CPT 99214:** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three key components: a detailed history; a detailed examination; medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or family.

- **CPT 99215:** Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three key components: a comprehensive history; a comprehensive examination; medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Typically, 40 minutes are spent face-to-face with the patient and/or family.

63. Effective March 1, 2020, CMS directs physicians and NPPs to use CPT Code 99211 to bill for a COVID-19 symptom and exposure assessment and specimen collection if such services are provided by clinical staff incident to the physician's or NPP's services. This applies to all patients—not just established patients. The direct supervision requirement may be

met through virtual presence of the billing physician or practitioner using interactive audio and video technology.[10]

64. CMS's authorization for providers to use CPT Code 99211 for specimen collection to enable testing for COVID-19 applies to billing for Medicare and Medicaid beneficiaries.

65. Most importantly, the fundamental component required for any claim to be payable by Medicare is that the service must be "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

66. Whether a service is "reasonable and necessary" is based upon the accepted practices in the medical community, and may be further defined by CMS's National Coverage Determinations by Medicare administrative contractors' Local Coverage Determinations for their respective regions.

### F. HRSA COVID-19 Uninsured Program

67. HHS's HRSA programs provide equitable health care to people who are geographically isolated and economically or medically vulnerable.

68. Administered through a contract with UnitedHealth Group, the HRSA COVID-19 Uninsured Program (HRSA or the HRSA Program) was created to reimburse healthcare providers for testing, treatment, and vaccine administration related to COVID-19 for uninsured individuals.[11]

---

[10] MLN Connects for Thursday, June 18, 2020, *available at* https://www.cms.gov/files/document/2020-06-18-mlnc.pdf

[11] Through its COVID-19 Coverage Assistance Fund, HRSA also reimburses providers for COVID-19-related services provided to individuals who have health insurance but are underinsured in terms of COVID-19 coverage, meaning their health plan either does not include such services as a covered benefit or covers such services but with cost sharing. Both the Assistance Fund and the Uninsured Program were implemented with the goal of supporting

69. Through the HRSA Program, providers who conducted COVID-19 testing, provided treatment, or administered vaccination for uninsured individuals with a COVID-19 primary diagnosis on or after February 4, 2020, could request claims reimbursement, subject to available funding,[12] electronically on a rolling basis, and would be reimbursed generally at Medicare rates.[13]

70. The HRSA Program was funded by bipartisan legislation, including the Families First Coronavirus Response Act (FFCRA) and the Paycheck Protection Program and Health Care Enhancement Act (PPPHCEA), which each appropriated $1 billion ($2 billion total) to reimburse eligible providers for conducting covered services. Moreover, (a) the Coronavirus Aid, Relief, and Economic Security (CARES) Act, (b) the Paycheck Protection Program and Health Care Enhancement Act (PPPHCEA), and (c) the Coronavirus Response and Relief Supplemental Appropriations Act (CRRSA) appropriated an additional $3 billion (collectively, the Provider Relief Fund), while the American Rescue Plan Act of 2021 allocated additional funding to reimburse providers for COVID-19 testing of uninsured individuals.[14]

71. For claims to the HRSA Program for COVID-19 testing and testing-related items and services, for treatment of positive cases of COVID-19, and for vaccine administration claims, a patient is considered uninsured if the patient did not have ***any healthcare coverage***—

---

providers in increasing access to COVID-related health services for individuals living in the United States. *See* https://www.hrsa.gov/covid19-coverage-assistance.

[12] The HRSA Program stopped accepting claims due to a lack of sufficient funds. As of March 22, 2022, no claim for testing or treatment may be processed for adjudication and payment. As of April 5, 2022, no claim for vaccine administration may be processed for adjudication and payment.

[13] *See* https://www.hrsa.gov/coviduninsuredclaim.

[14] *See* https://www.hrsa.gov/coviduninsuredclaim/frequently-asked-questions.

including coverage through an individual or employer-sponsored plan, or coverage under a federal or state healthcare program—at the time services were rendered.

72. Reimbursement under the HRSA Program was limited to qualifying testing for COVID-19, treatment services with a primary COVID-19 diagnosis, or for qualifying COVID-19 vaccine administration, as determined by HRSA (subject to adjustment by HRSA as necessary), including the following:

- Specimen collection, diagnostic and antibody testing.
- Testing-related visits including in the following settings: office, urgent care or emergency room or telehealth.
- Treatment, including office visit (including telehealth), urgent care, emergency room, inpatient, outpatient/observation, skilled nursing facility, long-term acute care (LTAC), acute inpatient rehab, home health, DME (e.g., oxygen, ventilator), emergency ambulance transportation, non-emergent patient transfers via ambulance, and FDA-licensed, authorized, or approved treatments as they become available for COVID-19 treatment.
- Dispensing fees for FDA-licensed or authorized outpatient antiviral drugs for treatment of COVID-19.

73. Services not covered by traditional Medicare were also not covered under the HRSA Program and were thus ineligible for reimbursement under the HRSA Program.

74. To access funding under the HRSA Program, a healthcare provider was required to: (a) properly enroll in the Program, (b) verify patient eligibility for funding, (c) submit patient information, (d) submit a claim to the Program for payment, and (e) receive payment via direct deposit. Further, under the HRSA Program the participating provider was required to consider

payment derived from the claim to the Program as payment in full for the covered service—balance billing of the patient was not permitted.

75. A provider wishing to participate in the HRSA Program was required to enroll in the Program as a "provider participant." To complete enrollment, the provider was required to attest to each of the following at the time of registration:

- "You have checked for health care coverage eligibility and confirmed that the patient is uninsured. You have verified that the patient does not have coverage through an individual, or employer-sponsored plan, a federal healthcare program, or the Federal Employees Health Benefits Program at the time services were rendered, and no other payer will reimburse you for COVID-19 vaccination, testing and/or care for that patient."
- "You will accept defined program reimbursement as payment in full."
- "You agree not to balance bill the patient."
- "You agree to program terms and conditions (PDF - 124 KB) and may be subject to post-reimbursement audit review." [15]

76. Among other pertinent terms and conditions, the HRSA Program's "Terms and Conditions for Participation in the HRSA COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program" notified participating providers of the following to enable a provider to submit a claim for payment under the HRSA Program:

[15] A PDF containing the Terms and Conditions for Participation is available at: https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/uninsured-program-terms-and-conditions-6-21.pdf (emphasis in original)

- "The Terms and Conditions [] are not an exhaustive list and the [provider] agrees to comply with any other applicable statutes and regulations."

- The provider "acknowledges that each time the [provider] submits [claims for reimbursement for COVID-19 Testing and/or Testing-Related Items and Services provided to individuals who did not have any health care coverage at the time the services were provided] each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms [the provider's] ongoing compliance with these Terms and Conditions."

- "The [provider] also certifies that to the best of its knowledge, the patients identified on the claim form were Uninsured Individuals at the time the services were provided."

- "The [provider] certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. If the [provider] subsequently receives reimbursement for any items or services for which the [provider] requested Payment from the Uninsured Program Fund, the [provider] will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source. The [provider] will not include costs for which Payment was received in cost reports or otherwise seek uncompensated care reimbursement through federal or state programs for items or services for which Payment was received."

- "The [provider] shall maintain appropriate records and documentation including, as applicable, documentation described in 45 CFR § 75.302 – Financial management and 45 CFR § 75.361 through 75.365 – Record Retention and Access, and

other information required by future program instructions to substantiate Payments under this award."

- "The [provider] understands that non-compliance with any Term or Condition and all applicable statutes and regulations may result in administrative, civil, and/or criminal action being taken."
- "The [provider] understands that failure to provide requested documentation may result in payments being denied and/or termination from the program."
- "The [provider] agrees that all claims it submits will be full and complete."
- "The [provider] shall consider Payment received from the [Program] to be payment in full for such COVID-19 testing and/or testing-related items, vaccine administration, care, or treatment."

77. Reimbursement pricing through the HRSA Program was based on the current year Medicare fee schedule rates except when otherwise noted, based on CMS codes, and based on the incurred date of service. Claims submitted through the HRSA Program were, and, to the extent still viable, still remain, subject to Medicare timely filing requirements.

78. To obtain reimbursement for qualifying services under the HRSA Program, participating providers were required to verify and attest that, to the best of the provider's knowledge at the time of claim submission, the patient was uninsured at the time the services were provided. For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and/or vaccine administration, this meant that the patient ***did not have any healthcare coverage*** including but not limited to coverage through an individual or employer-sponsored plan or coverage under a federal or state healthcare program.

79. Providers were permitted to submit a claim for uninsured individuals before Medicaid eligibility determination was completed. However, if and when the provider learned that the individual was retroactively enrolled in Medicaid as of the date of service, the provider was obligated under the Program to return the payment to HRSA. The HRSA Program provided instructions to providers for how to return any self-identified overpayment, which, along with a completed “Unsolicited Overpayment Refund/Notification Form,” was to be returned via check made payable and forwarded to UnitedHealthcare.

## V. FACTUAL ALLEGATIONS

### A. COVID-19 Background and Testing

80. As described on the Centers for Disease Control (CDC) website, COVID-19 is a respiratory disease caused by SARS-CoV-2, a coronavirus discovered in 2019. The virus spreads mainly from person to person through respiratory droplets produced when an infected person coughs, sneezes, or talks. Some people infected with COVID-19 may not have symptoms, while illness can range from mild to severe for people who experience symptoms.[16]

81. On March 11, 2020, the World Health Organization declared the novel COVID-19 outbreak a global pandemic.[17]

82. According to statistics maintained by CDC,[18] as of March 22, 2022, there were nearly 80 million cases of COVID-19 in the United States, and over 970,000 deaths in the United States attributed to COVID-19.

---

[16] https://www.cdc.gov/dotw/covid-19/index.html

[17] https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

[18] https://www.cdc.gov/coronavirus/2019-ncov/index.html

83. Per CDC's website,[19] people with the following symptoms may have COVID-19:

- Fever or chills
- Cough
- Shortness of breath or difficulty breathing
- Fatigue
- Muscle or body aches
- Headache
- New loss of taste or smell
- Sore throat
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea.

84. According to the CDC, COVID-19 testing is one of many risk-reduction measures—along with vaccination, masking, and physical distancing—that can reduce the chances of spreading COVID-19.[20]

85. COVID-19 tests can detect either SARS-CoV-2, i.e., the virus that causes COVID-19, or antibodies that the human body makes after contracting COVID-19 or after getting vaccinated. The CDC therefore urges that testing "is very important to help reduce the spread of COVID-19."[21]

---

[19] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

[20] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html

[21] *Id.*

86. Tests for SARS-CoV-2 determine whether the individual tested has an infection at the time of the test. This type of test is called a "viral" test because it looks for a viral infection.[22] Antigen or Nucleic Acid Amplification Tests (NAATs) are viral tests.[23] A viral test is able to determine if the individual is infected with SARS-CoV-2 using samples that come from the individual's nose or mouth.

87. There are two types of viral tests: rapid tests, which are capable of being performed in minutes, and laboratory tests, which can take days for results to be provided. Rapid tests (such as an "Antigen test") are usually performed by way of nasal swab and can be performed in minutes (results usually within 15-30 minutes), but the results may be less reliable for people without symptoms. Laboratory tests (such as a "PCR test"), on the other hand, can be performed either by way of nasal swab or collection of saliva and can take days to complete, but results are generally more reliable for people with and without symptoms. Rapid Point-of-Care tests are rapid tests performed or interpreted by someone other than the individual being tested, while self-tests can be taken at home or anywhere. [24]

88. According to the CDC,[25] there are five "reasons to get tested":

1) If an individual has COVID-19 symptoms;

---

[22] Alternatively, tests for antibodies—proteins that the immune system makes to help fight infection and protect against getting sick in the future—can determine if the individual had a past infection with the virus that causes COVID-19. The human body creates antibodies after getting infected with SARS-CoV-2 or after getting vaccinated against COVID-19. These tests are called "antibody" or "serology" tests and are used to detect antibodies to SARS-CoV-2 in the blood. Antibody tests are not used to diagnose a current infection but indicate if the individual had a past infection. *See* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html

[23] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html

[24] *Id.*

[25] *Id.*

2) At least 5 days after known or suspected close contact to COVID-19;

3) For screening for schools, workplaces, congregate settings, etc.;

4) Before and after travel; or

5) When asked by a healthcare professional or public health professional.

89. According to the New Jersey COVID-19 Information Hub,[26] available on the Official Site of the State of New Jersey, "[t]esting is available to everyone in New Jersey," and "[y]ou don't need insurance and free testing is available." Further, "[i]t's especially important to get tested if" the individual:

1) Has COVID-19 symptoms after being exposed, even if fully vaccinated or recently recovered from COVID-19 in the last three months;

2) Has been in close contact with someone who tested positive for COVID-19;

3) Was recently in a large gathering where social distancing was hard to maintain or a crowded indoor setting and is not fully vaccinated or recently recovered; or

4) Must travel and is not fully vaccinated.

90. Pre-operative testing for surgical patients—where a patient is expected to undergo a surgical procedure in the near future—is another reason to get tested for COVID-19 and is often required by healthcare facilities, including Riverside.[27]

91. Accordingly, there is a spectrum of reasons why an individual may seek testing for COVID-19. For example, as described in #1 above, an individual may seek testing because he or she is symptomatic for the disease and there is thus a strong possibility the individual is infected with COVID-19. Conversely, another individual may have no COVID-related health

---

[26] https://covid19.nj.gov/pages/testing

[27] https://www.riversidemedgroup.com/coronavirus/

concerns whatsoever but may seek testing merely as a precaution to enable recreational activity (e.g., travel for vacation or participation in a sporting event).

92. On its website, HHS states[28] that "[l]ow or no-cost COVID-19 tests are available to everyone in the U.S., including the uninsured, at health centers and select pharmacies nationwide." In regard to health centers, HHS states:

> Health centers provide COVID-19 testing services to individuals who meet criteria for COVID-19 testing, regardless of their ability to pay. Health centers will determine whether there is available reimbursement, funding, or compensation sources, and any related cost sharing restrictions for COVID-19 testing prior to billing patients. If there are any out-of-pocket costs—for example, in the case of no or only partial coverage by private insurance—health centers will provide sliding fee discounts for eligible patients based on income and family size.

93. As to testing for COVID-19, according to the official 2022 Medicare booklet titled "Your Medicare Benefits,"[29] Medicare Part B covers FDA-authorized COVID-19 antibody tests and diagnostic tests. Additionally, the booklet states "[y]ou pay nothing for the antibody tests during the COVID-19 public health emergency," and "[y]ou pay nothing for a diagnostic test during the COVID-19 public health emergency when you get it from a laboratory, pharmacy, doctor, or hospital, and when Medicare covers this test in your local area."

## B. Background of Riverside and Relator

94. Riverside advertises[30] itself as providing "services across the care continuum—from preventative medicine to diagnostics to treatment and beyond." According to Riverside, it

---

[28] https://www.hhs.gov/coronavirus/community-based-testing-sites/index.html

[29] https://www.medicare.gov/Pubs/pdf/10116-your-medicare-benefits.pdf

[30] https://www.riversidemedgroup.com/about-us/

is "a truly integrated health system" with clinicians practicing "in primary care, urgent care and more than 25 specialties, as well as ambulatory surgery, imaging and more."

95. At all times relevant hereto, Riverside operated, and continues to operate, "COVID Command Testing Centers" at three New Jersey locations: Secaucus, Medford, and Hoboken.[31]

96. According to Riverside's website, "[t]esting is available to any Riverside patient who is experiencing COVID-like symptoms or those who require testing to return to work. In order to receive testing, you must be evaluated by a Riverside medical provider first."[32]

97. The New Jersey COVID-19 Information Hub includes a "Test Site Finder"[33] to enable individuals to "[f]ind testing locations near you, including their hours and testing requirements." In regard to Riverside's Secaucus "COVID Command Testing Center," the following information, in pertinent part, is provided by New Jersey's Test Site Finder:

> Riverside Medical Group – Secaucus Drive Thru
> Rapid Testing Results in 15 Minutes
> Non-Rapid Testing Results in 3 Days
> Appointment Required
> Screening Required
> Call (201) 863-3346 to complete screening prior to visiting the facility for testing. In order to receive testing, you must be evaluated by a Riverside medical provider first.

98. Relator is a physician, employed by Riverside at all times relevant hereto. During Relator's tenure as a physician at Riverside, Relator developed relationships with countless patients. In the course of Relator's employment, including his communication with patients,

[31] https://www.riversidemedgroup.com/coronavirus/

[32] *Id.*

[33] https://covid19.nj.gov/pages/testing#test-sites

Relator discovered Riverside's fraudulent billing scheme, prompting Relator's further investigation.

### C. Riverside Billed for Services Not Provided or That Were Medically Unnecessary

99. Riverside advertises that, "[i]n order to receive testing, you must be evaluated by a Riverside medical provider first." In practice, Riverside requires each patient to schedule an appointment for drive-thru testing, at which time the patient completes a brief screening via telephone.[34]

100. As previously set forth, effective March 1, 2020, CMS directed physicians and NPPs to use CPT Code 99211 to bill for a COVID-19 symptom and exposure assessment and specimen collection if certain requirements are met, including if such services are provided by clinical staff incident to the physician's or NPP's services.

101. Notwithstanding CMS' directive, and the clear CPT Code descriptions to be followed by health care providers, Riverside has billed, and continues to bill, drive-thru-test patients at higher-than-appropriate CPT Codes, including improperly submitting CPT Codes 99212, 99213, 99214, and 99215 for payment. In many known patient examples, the patient was asymptomatic, and sought testing for entrance to school or the workplace, to enable travel, or as required prior to undergoing a medical procedure. In the overwhelming majority of known examples, the patient was not provided with any meaningful examination and, further, did not exit his or her car upon arrival at the Command Center.

102. Additionally, upon information and belief, Riverside staff falsified patient records (e.g., patient progress notes) in an effort to conceal that examinations were not being performed.

---

[34] This is consistent with patient descriptions of the drive-thru encounters as well as New Jersey's Test Site Finder website, which states that patients are expected to "call (201) 863-3346 to complete screening prior to visiting the facility for testing."

For example, on one sample day, December 21, 2021, 20 patients were "examined" by one Riverside provider, all of whom had the exact same "physical findings" recorded in their respective progress notes, and 18 of those patients had the same "patient history" recorded on their respective progress notes.

103. The following are examples of the false claims being submitted by Riverside—including claims to CMS and private insurance carriers—in regard to its COVID-19 testing:

a) Patient A scheduled an appointment for July 8, 2020, to receive drive-thru testing at Riverside's Secaucus Command Center. Patient A was asymptomatic, had no clinical requirement for an examination and, in fact, was never examined by a Riverside provider. Patient A's entire encounter was completed in "a few minutes," and Patient A was not provided with "an expanded problem focused examination" nor was she provided with any "counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies." For the encounter, Riverside submitted two claims to CMS under CPT Code 99213 (presumably, one for the telephone screening on July 7, and the other for the test on July 8), for which CMS was charged $245 and $345, respectively, and paid a total of $124.64.

b) With symptoms of minor chills and fatigue, Patient B (Patient A's spouse) scheduled two appointments for drive-thru testing at Riverside's Secaucus Command Center: one on July 8, 2020, and the other on July 9, 2020. Patient B completed brief telephone screening for each appointment and, upon arrival, his temperature was checked and vitals were taken, and he received a quick nasopharyngeal swab[35] for COVID-19.

[35] A nasopharyngeal swab is a device used for collecting a sample of nasal secretions from the back of the nose and throat.

The entire encounter lasted approximately three minutes. Patient B was not provided with "an expanded problem focused examination," nor was he provided with any "counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies." Riverside submitted two claims to CMS for Patient B's encounters, each under CPT Code 99213, for which Riverside charged $245 and $345, respectively, per visit, and received reimbursement from CMS of $57.70 and $124.64, respectively.

c) Patient C sought drive-thru COVID-19 testing at Riverside's Secaucus Command Center on March 18, 2020. According to Patient C, he never got out of his car and was never examined; Patient C certainly did not receive a "comprehensive examination," "medical decision making of high complexity," or "counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies." Nonetheless, Riverside submitted CPT 99215 to Patient C's insurance.

d) Patient D presented to Riverside on January 19, 2021, for drive-thru COVID-19 testing. According to Patient D, he was never examined, his entire encounter was completed in "a few minutes," and Patient D was not provided with "an expanded problem focused examination," nor was he provided with any "counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies." Riverside submitted CPT Code 99213 to Patient D's insurance carrier, Horizon Blue Cross Blue Shield of New Jersey, indicating "OFFICE/OUTPATIENT ESTABLISHED LOW MDM 20-29 MIN."

e) Patient E presented to Riverside on June 4, 2020, to obtain pre-operative-clearance COVID-19 testing. It was not medically necessary for Patient E to receive an

examination in conjunction with the swab testing. Patient E did not receive any examination in conjunction with his pre-operative COVID-19 test, and certainly did not receive a "detailed examination," an examination of "25 minutes," or "medical decision making of moderate complexity" consistent with the description for CPT Code 99214. Riverside nevertheless submitted CPT Code 99214 to Patient E's insurance carrier.

f) Patient F is a school teacher and, at all times relevant hereto, was required to provide proof of a negative COVID-19 test on a weekly basis to enter the school. Patient F sought testing by Riverside every Friday for this purpose and presented to Riverside on November 6, 2020, to obtain a COVID-19 swab test. There was no medical necessity for Riverside to perform an examination of Patient F. Patient F confirmed that he was not examined by a provider, but his temperature and pulse were obtained quickly prior to the swab test. Riverside submitted CPT Code 99212 to Patient F's insurance carrier.

g) Patient G was required to seek COVID-19 testing upon returning from a trip to California. Patient G was never examined, never exited her car at Riverside's Secaucus Command Center, and a swab test was quickly performed. Even so, Riverside designated the visit as CPT Code 99213.

h) Patient H sought COVID-19 testing on August 31, 2020, so that she could visit with her elderly parents without concern of spreading the virus. Patient H was asymptomatic, was never examined, and an examination was not medically necessary. Nonetheless, Riverside designated the visit as CPT Code 99213.

104. Again, effective March 1, 2020, CMS directs physicians and NPPs to use CPT Code 99211 to bill for a COVID-19 symptom and exposure assessment and specimen collection

if such services are provided by clinical staff incident to the physician's or NPP's services. Upon information and belief, the drive-thru testing described above is not being performed incident to a physician's or NPP's services. In such instances, Riverside's submission of even a 99211 CPT Code is a false claim.

105. In regard to the potential magnitude of Riverside's fraud, available documentation confirms the following volume of testing performed by a single Riverside provider on certain sample days at the referenced Command Center:

| **Date** | **Provider*** | **Location** | **Patients** | **Timespan** | **Patients/Hour** | **Minutes/Patient** |
|---|---|---|---|---|---|---|
| 03/05/2021 | "Jane Doe, APN" | Hoboken | 322 | 9 Hours | 35.77 | 1.68 |
| 01/05/2021 | "Sally Soe, APN" | Secaucus | 451 | 7.75 hours | 58.19 | 1.03 |
| 01/13/2021 | "Patty Poe, APN" | Secaucus | 345 | 8.5 Hours | 40.59 | 1.48 |
| 01/22/2021 | "Betty Boe, APN" | Hoboken | 314 | 6.75 Hours | 46.52 | 1.29 |

*Fictitious name attributed to single advance practice nurse (APN) referenced in documents.

106. With reference to the above table, Riverside documentation indicates that, on January 5, 2021, one advanced practice nurse (APN) ***tested approximately 451 patients over a span of 7.75 hours***. Assuming the APN worked continuously without any break, this equates to ***over 58 patients tested per hour and 1.03 minute spent by the provider per patient encounter***.

107. Upon information and belief, Riverside submitted to government healthcare programs—including, but not limited to, Medicare, Medicaid, and HRSA—directly or indirectly, a CPT Code greater than 99211 for each patient tested. Upon information and belief, the patients included masses of Medicare and Medicaid beneficiaries, as well as uninsured individuals for which reimbursement was sought through the HRSA Program.

108. Upon information and belief, Riverside has not refunded to such government healthcare programs any amounts Riverside received for payments derived from its upcoding for COVID-19 testing services.

## VI. CAUSES OF ACTION

**COUNT ONE - VIOLATION OF THE FCA, 31 U.S.C. § 3729(a)(1)(A)**

109. Relator incorporates herein by reference and realleges each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

110. Riverside knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer of employee of the United States.

111. Riverside knowingly presented false records and statements including, but not limited to, claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by government healthcare programs—including but not limited to Medicare, Medicaid, and HRSA—for services that were not rendered to patients or services that were medically unnecessary.

112. The conduct of Riverside violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount to be determined at trial. Relator is therefore entitled to treble damages under the FCA, plus civil penalties of not less than $11,665, and up to a maximum penalty of $23,331, for each false claim presented or caused to be presented.

**COUNT TWO - VIOLATION OF THE FCA, 31 U.S.C. § 3729(a)(1)(B)**

113. Relator incorporates herein by reference and realleges each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

114. Riverside knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

115. Riverside knowingly made, used, and/or caused to be made and used false records and statements including, but not limited to, claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by government healthcare programs—including but not limited to Medicare, Medicaid, and HRSA—for services that were not rendered to patients or services that were medically unnecessary.

116. The conduct of Riverside violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount to be determined at trial. Relator is therefore entitled to treble damages under the FCA, plus civil penalties of not less than $11,665, and up to a maximum penalty of $23,331, for each false claim presented or caused to be presented.

**COUNT THREE - VIOLATION OF THE FCA, 31 U.S.C. § 3729(a)(1)(G)**

117. Relator incorporates herein by reference and realleges each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

118. Riverside knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

119. As detailed above, Riverside received far more money from government healthcare programs—including but not limited to Medicare, Medicaid, and HRSA—than it was entitled to. Riverside knew that it had received more money than it was entitled to and avoided its obligation to return the excess money to the Government.

120. The conduct of Riverside violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount to be determined

at trial. Relator is therefore entitled to treble damages under the FCA, plus civil penalties of not less than $11,665, and up to a maximum penalty of $23,331, for each false claim presented or caused to be presented.

**COUNT FOUR - VIOLATION OF THE NJFCA, N.J.S.A. § 2A:32C-3**

121. Relator incorporates herein by reference and realleges each and every allegation of the preceding paragraphs of the Complaint as though fully set forth herein.

122. This is a civil action brought by Relator, in the name of the State of New Jersey, against Riverside, pursuant to the NJFCA, N.J.S.A. § 2A:32C-5(b).

123. The State of New Jersey and/or one of its agents contracted, directly or indirectly, with one or more carrier contractors in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New Jersey.

124. MACs directly or indirectly contracted with Riverside in connection with the administration of claims for reimbursement from Medicaid.

125. Riverside, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be causing to be presented, to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval under the New Jersey Medicaid program, in violation of N.J.S.A. § 2A:32C-3(a).

126. Riverside, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made

or used, false records or statements to get false or fraudulent claims paid or approved by the State, in violation of N.J.S.A. § 2A:32C-3(b).

127. Riverside, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the State, in violation of N.J.S.A. § 2A:32C-3(g).

128. The State of New Jersey and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Riverside, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that were never provided or are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

129. As a result of Riverside's actions, as set forth above, the State of New Jersey and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT FIVE - UNJUST ENRICHMENT**

130. Relator incorporates herein by reference and realleges each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

131. This is a claim by the United States and New Jersey for recovery of monies by which Riverside has been unjustly enriched.

132. By virtue of the conduct and the acts described above, Riverside was unjustly enriched at the expense of the United States and New Jersey in an amount to be determined,

which, under the circumstances, in equity and good conscience, should be returned to the United States and New Jersey, respectively.

**COUNT SIX - PAYMENT BY MISTAKE**

133. Relator incorporates herein by reference and realleges each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

134. This is a claim by the United States and New Jersey for the recovery of monies paid to Riverside by mistake on behalf of Medicare or Medicaid beneficiaries, or on behalf of uninsured individuals through the HRSA Program, who did not qualify for the benefit described above, for services that were medically unnecessary, services that were not provided or were inappropriate, and/or claims that were otherwise false.

135. As a consequence of the conduct and the acts set forth above, Riverside was paid by mistake by the United States and New Jersey in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States and New Jersey, respectively.

**COUNT SEVEN - RETALIATION**

136. Relator incorporates herein by reference and realleges each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

137. Relator was engaged in conduct protected under the FCA, NJFCA, and the New Jersey Conscientious Employee Protection Act, N.J.S.A. § 34:19-3, including the investigation and reporting of fraud as described herein.

138. Relator took professional objection to Riverside's activities, policies, and practices described in this Complaint, believing same to be fraudulent, incompatible with a clear

mandate of public policy concerning the public health and welfare, and in violation of law, rule, or regulation promulgated pursuant to law.

139. Riverside knew that someone in Relator's position would object to the activities, policies, and practices described in this Complaint; thereby inducing Relator's discomfort with, and opposition to, working under such conditions.

140. As a result of Riverside's wrongful imposition of such unlawful working conditions, Relator's working environment became so intolerable that any reasonable person in the employee's position would have felt compelled to resign.

141. By fostering an unlawful working environment, Riverside caused Relator to suffer, and continue to suffer, substantial professional harm, and financial and emotional damage in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator prays that judgment be entered against Riverside, ordering as follows:

A. That Riverside cease and desist from violating 31 U.S.C. §§ 3729-3733, as amended, and the New Jersey False Claims Act, N.J.S.A. §§ 2A:32C-1 to -18;

B. That civil penalties of not less than $11,665, and up to $23,331, per claim as provided by 31 U.S.C. § 3729(a) and adjusted for inflation be imposed for each and every false or fraudulent claim that Riverside caused to be submitted to the United States and/or its grantees, for each false record or statement Riverside made, used, or caused to be made or used that was material to a false or fraudulent claim, that three times the amount of damages the United States sustained because of Riverside's actions also be imposed;

C. That judgment be entered in Relator's favor and against Riverside in the amount of damages sustained by the State of New Jersey or its agencies or political subdivisions, multiplied as provided for in N.J.S.A. § 2A:32C-3, plus a civil penalty of not less than $11,181, or more than $22,363, as allowed and adjusted under the federal False Claims Act (31 U.S.C. § 3729, *et seq.*) for each act in violation, to the extent such penalties shall fairly compensate the State of New Jersey or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Riverside, together with penalties for specific claims to be identified at trial after full discovery;

D. That Riverside be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

E. That Riverside disgorge all sums by which it has been enriched unjustly by its wrongful conduct;

F. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h); N.J.S.A. § 2A:32C-1 and § 2A:32C-10; and N.J.S.A. § 34:19-5;

G. That Relator be awarded all costs, including but not limited to, court costs, expert fees, and all attorney's fees, costs, and expenses incurred by Relator in the prosecution of this suit; and

H. That Relator be granted such other and further relief as the Court deems just and proper.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

I hereby certify that to the best of my knowledge the matter in controversy is not the subject of any other pending action, arbitration, or administrative proceeding. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a trial by jury of all issues so triable.

Dated: May 31, 2023

Respectfully submitted,

SEEGER WEISS LLP

*s/ Stephen A. Weiss*

STEPHEN A. WEISS
JUSTIN M. SMIGELSKY
STEVEN J. DAROCI
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
Fax: (973) 639-9393
sweiss@seegerweiss.com
jsmigelsky@seegerweiss.com
sdaroci@seegerweiss.com

SHAUNA B. ITRI
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
Tel: (215) 564-2300
Fax: (215) 851-8029
sitri@seegerweiss.com